Morning, your honors. My name is Carl Gunn. I'm representing Mr. Kirkland. I will start with the destructive device sufficiency of evidence issue unless your honors want to direct me somewhere else. There are at least three reasons the statutory language should be interpreted to require possession of all the parts. First, there's the plain language as pointed out in the Malone case. The statute says, as Malone pointed out, quote, from which a destructive device may be readily assembled, unquote. It doesn't say, quote, from which a destructive device may be readily assembled with the addition of other parts, unquote. And there's at least three other cases that agree that means all the parts. There's the Blackburn case, the Pozenak case, the panel opinion in Hamrick. Second, I'm sorry. Okay, so the problem just from a standpoint of is that, number one, Malone, you kind of leave out that little extra sentence they threw in, which said that we're limiting our holding just to the circumstance where the explosive material itself is not present. Well, no, they actually say we're limiting it to the facts of our case or something to that effect, yes. Okay, so we got that. And then each of the other cases you cited where a circuit started to go down the Malone Road, there are later cases in which the court very much backtracked on that, I think, and upheld convictions on facts not that dissimilar from ours, right? I don't think so, Your Honor. In Pozenak, there's the Sheehan case, which I'll talk about in a minute. I don't believe there's a Fourth Circuit case, which is where Blackburn happened. Hamrick... There's a later Judge Luttig opinion in the Fourth Circuit that's after Hamrick, even. Which opinion are you talking about, Your Honor? The Hamrick, of course, the en banc court. No, it's a different case than the Hamrick. Right. Hamrick, the en banc court, backed off, but they didn't, they based it partly on a different understanding of the facts. But there's two other reasons, Your Honor, should adopt the interpretation I'm suggesting or arguing for it. You also have the, they said it in one place, so they knew had to set it, principle of construction. Because in the machine gun definition, they specifically include any part that's solely designed to make a machine gun. They're not envisioning just individual parts in that case. The third problem, and I think the biggest one here, in a way, is that you just get on a horrible slippery slope if you don't draw the line at all the parts. Consider the proposed options that I've seen out there. In the Sheehan case, they had this, quote, key components, unquote, distinction. The government's brief has this, quote, nearly fully assembled, unquote, suggestion at one point. Another suggestion in the government's brief is all but the things you can drive to buy at the corner store, unquote. How do you decide those things? If you go with key components, well, are batteries a key component? Frankly, I would argue that batteries are a key component. Key component doesn't mean a key component that's dangerous like the dynamite or illegal like the dynamite for some people to possess. If you go with nearly fully assembled, what's nearly? If you go with all but the things you can buy at the corner store, what corner are we talking about? What store? How easily do they need to be purchased? Now, batteries may seem easy. Okay, why isn't the last one? The last one seems attractive to me. The corner store? Not the corner store. But something easily available. Exactly. Yeah, what's wrong with that? But what's easily available, your honor? Does it have to be at a Home Depot or a drugstore or is it enough if it's at a specialized auto parts type store? The statute already leads us down this road, doesn't it though? Because it talks about readily converted and readily assembled. I mean, there is this notion of how easy it is to finish it in the statute itself. When you have all the parts, maybe. I'm not sure that any court has taken that readily and talked about how if it's too hard to put together that doesn't count. I think the way the courts have interpreted it and the right place to draw the line is having all the parts and they can be put together. If you buy a toy for your kid and it needs batteries and you think the batteries are included and it turns out they're not, you've got this box with the car and all it needs is the batteries, is it, do you have a claim that it's not readily assembly, assemblable? I mean, the statute says readily, right? And here's your toy and all you need is batteries. It's not that hard. It's not a combination of parts from which the device can be readily assembled. There's lots of frustrated kids on Christmas when their parents didn't get them the batteries and they found out they weren't in the box. Because it's not readily assemblable? No, no, you've gone by the batteries but you don't have the toy. The kid can't play with the toy until you get the batteries. You don't have the toy until you have the batteries. You don't have the device until you have the batteries. Now the problem, to go back to my slippery slope, batteries... The statute says readily assembled. Right, but it says... It doesn't say you've got the whole thing ready that's done. Well, it's a combination of parts from which it can be readily assembled. That doesn't mean going out and getting other parts. At least that's what the cases I just gave you all say. It means all the parts. But also, what parts are we talking about then? Is it enough to have everything but the batteries? I don't think batteries are that easy. Maybe your honors do. What about if the capacitor wasn't there? What about if the radio frequency receiver wasn't there? What about if the push button switch, which was one of the things in the other box, wasn't there? You just... What is the line? It has to be something more than just the explosives, it seems to me. And then the place to draw the line and what's consistent with the statutory language and contrasts with what they said for machine guns is all the parts. Now you mentioned the Sheehan case, your honor. The Sheehan case, I think, is first of all problematic because it has this key components distinction. Second, you were talking to them, the missing part, if there was a missing part there, was tape. But there was actually tape somewhere else on the device. So he actually had tape that he could have taken a piece off of and moved to where he needed it to make the device work. You don't have to have it put together. You just have to have the things... If my client had the batteries sitting in his kitchen, eight of them, 8C batteries, then he would satisfy... I understand they had the tape on the device, but it doesn't seem like the rule the court articulates depends on that. So would we be creating a split with the Second Circuit if we said all the parts have to be there? I don't think you would necessarily because you might and you might not. First of all, you could certainly point out that the tape was there in Sheehan. Second of all, I would prefer a key component. They may be a key component that you can buy at a drugstore, but they're a pretty key component. This thing doesn't... A power source, and the word power source, that sounds pretty important to me. So I think you don't have to actually vary from Sheehan. If you adopt Sheehan's key component standard, I think you find the batteries here are key components. What about the fact that in this case, that if there was sufficient pressure or static electricity, this bomb could have gone off? It could have. The problem... I mean, doesn't that undercut your whole argument about what readily accessible is? It doesn't, Your Honor, because there's the additional requirement of designed to be and or intended to be. And I think you would have to find that this was designed to go off by static electricity or intended to go off by static electricity. And I don't think that the static electricity doesn't work as a theory. So when the court says readily available materials in Sheehan, you don't think that means easily obtainable? Well, but it also has language that requires the key components. If I can find my quote in the opening brief of Sheehan... But Sheehan does an alternative analysis for a fully assembled device versus a combination of parts. And I think the language that Judge Freeland is reading from is the one... Because we're not dealing with a fully completed thing. They only charge your client under the combination of parts. Well, Sheehan says, and this is quoted in my opening brief at page 22, the government need not offer evidence that the defendant possessed commonly available materials such as tape if the defendant otherwise possesses all of the, quote, key components, unquote. So I think that's the problem. Sheehan sort of has this exception that's not in the statute, the readily available materials, whatever that means. And then there's an exception to the exception of, oh, but if they're key components... There's this other articulation, though. A rational jury could conclude that Sheehan's device, which indisputably lacked a functional fusing system, was a partially completed device designed in such a way that with readily available materials, it could have been converted into a functional device. Well, but then I think that's qualified by the language I just read, which is at page 125. I don't remember exactly where Your Honor's language is. Page 122. Yeah. At page 125, it says, the government need not offer evidence that the defendant possessed commonly available materials such as tape if the defendant otherwise possesses all of the key components, which I read as a qualification to the readily available materials. Well, I mean, let me just ask you, maybe strain a little bit from the text of the statute, just to the purpose. I mean, I think we all have a gut sense as to what Congress was trying to get at with that last clause. I don't have it in front of me readily. Right, right. There's two things, but there's two competing concerns, and I think Your Honor's thinking of one of them and forgetting the other. One is they want to keep these dangerous devices. You know, this was the Firearms Act that put controls on guns federally and so on back in 68, and they were worried about violence on the streets and things like that and people making bombs and so on. On the other hand, they knew there were a lot of people out there in the commercial industries that used dynamite and explosives and blasting caps, and they didn't want someone who happened to have dynamite and blasting caps to all they'll get. Right. So what they decided to do is when it's commercial explosives like that, a combination of things that could be made into a bomb, were going to require, first of all, the designer intent, and then they chose to require all the parts. They chose, I mean, they drew a line somewhere, however you interpret that language, but they drew that qualification. They said, yeah, we'll exclude bombs, we'll exclude missiles, we'll exclude bazookas, we'll exclude hand grenades, we'll exclude all the things that are legitimate use for those. But these things, like everything in this device, had a legitimate use, separately, and so what they said is, I think what they said, is basically, in order to draw the line between things that might be intended for commercial use and things that aren't, we're going to require a combination of all parts. But is there any way this was for commercial use? I mean, even on the line you're describing, wouldn't Congress have wanted this to be criminalized? Sure, but let me read you the description in Malone, because I think Congress would have wanted that criminalized. This sounds as sinister, if not more. This is the second paragraph of Malone. One pressure-release spring-top box containing a military MK-2 fragmentation hand grenade hole inserted rigidly to the inside of the box. Miscellaneous electrical wires inserted into the top of the hand grenade body. One microswitch, one electrical solenoid switch, one transistor battery, one small low-voltage electrical bulb, glue, tape, small aluminum metals, nails, waterproofing spray, and one container of Play-Doh. That sounds just as sinister as what my client had, and Congress, I think, would have liked that also. Not if the person didn't actually acquire the explosive material. Let me just, before we veer off, what I was trying to get at in terms of the purpose, what I think that language is trying to capture, we want to punish people who, at least when we're talking about the combination of parts, right? Because we don't want somebody who just has a bunch of random stray things scattered about their house, which unbeknownst to them, maybe, could actually be combined into an explosive device, right? We don't want to punish that person. So we want some indication that the person has actually taken intentional steps to gather together the things to produce something, and that's why you have the designer intent language. But I think the readily assemblable language gets at that same thing. And here, we don't have much of a concern that your client was up to no good, right? That's why it seems to me it's a case that- Actually, I'm not totally sure of that, Your Honor. He said he was goofing off many times. He said he'd put this thing together to basically show this woman who was jumping over his fence something to scare her away without necessarily saying he was going to put it out there to try to blow her up if she tried to come over. So there's actually some suggestion in the record in his own statements. It's not so clear he wasn't just sort of goofing around and putting some together. And certainly, if we're talking about something like shotgun shells, if there wasn't dynamite in there, and the jury found in a special verdict did not find shotgun shells. Yeah, if you blow up shotgun shells that have birdshot in them, it's dangerous. But that's not what you typically make a bomb out of. You typically make a bomb out of something like a high explosive or plastic explosive or dynamite or something. So actually, I think there's an argument that he was not at that point yet. And I think- I'm saying it's not like he had a bunch of parts scattered about. He had gathered them all together and had basically assembled the insertion of the power source, right? Maybe. And maybe but for insertion of additional real explosive if he intended to do that. Well, the jury was instructed to find that. So that's what I'm saying. I don't know. I guess I'm not bothered by upholding your client's conviction because it doesn't seem to me we're in the category of cases that Congress was trying to exclude. The problem is you don't know. You just create this line drawing problem, this slippery slope problem. I mean, batteries, you know, but certainly I think if you're looking at how sinister it seems, what's described in Malone sounds just as sinister as what we have here. Can I ask you why this has been framed as a sufficiency of the evidence issue instead of a jury instruction element problem? Well, I mean, maybe I should have framed it as a jury instruction element. I think I do, in a footnote, broach the idea that if there's a key element standard, then you have a deficiency in the jury instructions because there's nothing in the jury instructions telling the jury. It just feels a little bit odd to be talking about sufficiency when the jury was never asked to find this. So it's like a mental leap. It feels more like it should have been a jury instruction issue. And I'm wondering if the difference has any meaning for us. I do broach in a footnote that if there's a key component standard that you take, if there's not a key component standard out of Sheehan, then it seems to me the defense prevails here. If he really has to have all the parts, he didn't have all the parts because there weren't any batteries. But if we rule that, then in the future, the jury instructions will need to say that, right? I think so, though arguably depending on how you interpret, you know, from which can be readily assembled, the jury instructions might say that. But I think you're right. And then the place I think there might need to be, I mean, if there's a key component standard, you know, then it would be a jury question whether the batteries are a key component. I suppose. I frankly think as a matter of law, batteries are a key component. If you don't agree, then there's a jury instruction problem here and there's plain error in the jury instructions, I think. Though it might be a little harder to argue a plain error that that was plain in the jury instructions. And the sufficiency, of course, you have the Ninth Circuit case law that suggests there's really not a difference. Let's, why don't we hear from the government. You're over your time, but we'll give you some time for about. All right. Thank you. I'll submit it on the other issues, obviously. Okay. Yes. Good morning, and may it please the court. Angela Scott for the United States. There was no plain error in this case, particularly where we were dealing with a device that had no legitimate purpose and which was assembled to the point that a nine volt battery or static electricity. Why don't you address the line drawing concern that your opponent has raised? Because that obviously is the thing that gives us the most concern. I do understand that. Although I, in this instance, as in, as in most instances, I, I do, the government does not believe that it's hard to distinguish between what a common item is and batteries are certain. Put yourself in our shoes. Assuming that we were going to publish an opinion in this case, what, what's the legal rule that you would have us announce? What's the line that you would have us draw? I believe actually that the line to be drawn here is that the very fact specific and looking, even looking at Malone, let's say that the, the evidence was that he had the explosive material at his house. I think that would be a different, a different analogy. That he had the explosive material at his house. I think that would be a very, yes, he was in his car. If he had the explosive material at his house, I have a feeling the would have been readily assembled. So I, I don't, I'm sorry, I was asking for language. You've meandered down to, I'm asking you this point blank. You're charged with writing the opinion. What's the language you would use to articulate the rule that you would like us to announce? Not, not, don't reference other cases. I'm just asking you what a legal rule. I believe that the legal rule is already as stated, readily assembled, and there does not need to be a key component or, or ubiquitous item. You just cite the language of the statute and we stop and we say, there you have it, everyone. It's perfectly clear. Great. Go, go on about your business. I don't think that works. So you don't have, you don't have something to offer. You know, your opponent said that, well, there are these kind of three alternatives, none of which he finds attractive. Do you want to pick one of those? Do you have another one? That's what I'm asking. Right. I, I believe that, um, in this instance, um, key components is, is not the, the appropriate selection because, um, something can, can perhaps be, um, um, readily available yet may seem to be more integral to the device than something like tape. Um, however, that doesn't make it any less readily assemblable, um, because of the nature of the, the item. So it sounds like you want a readily obtainable rule. So if something is missing, then as long as it's readily obtainable, that's okay. I, I think that is actually appropriate because that is in line with the readily assembled statutory language. Um, so then batteries do seem to be readily obtainable, but dynamite is maybe readily obtainable. I've never tried to buy it. Is there anything that makes dynamite harder to obtain than batteries? Um, I, I do believe to, uh, to a standard individual dynamite would be harder to obtain the batteries. But again, that's why I think it's very important to look at them. Is that true? Can you buy it at the hardware store? I don't actually, I didn't try to do research outside the record on that. I'm sorry. I, I don't know. I, I don't think I've seen that. Can I change it a little bit because here the explosive, um, found by the jury was merely shotgun shells. And I assume that you would have to concede that those, I can go to the sporting goods store right here in Pasadena and get that, right? Uh, yes. And also the blasting caps had explosives in them as well in this particular case. Okay. But I'm saying like in a case though, where, um, you know, let's say we had this device absent the shotgun shells, right? Um, under Malone, it would seem that that would not be, there wouldn't be sufficient evidence, but under your rule, I guess you'd say we, we would have to uphold the conviction. No? No, I don't believe so. Because in this case, what's very important here is that the, the device was quite constructed and. Okay. So let's talk about a quite constructed device that doesn't have the shotgun shells, this device with batteries, but not the shotgun shells. Would you get convicted then? Um, without the shotgun shells, I think the government might have a difficult, difficult time proving that it was designed to be a weapon because it is the and presumably if he had said what he said about the purpose for which he constructed it, you'd prove it under intent. So I don't think that, that doesn't solve the problem. Well, in this instance, actually the jury found design and not intent. What about if you needed a nine-volt batteries instead of C batteries? Can we try running around the house trying to find a nine-volt battery? At Christmas, yes. Yes. Um, yes, but again, I think in the, in the concept of something being readily assembled, a nine-volt battery is, is, um, is something that can be, um, obtained pretty easily as opposed to explosives, um, as was the case in Malone. Additionally, in, in our particular case, I would like to point out that this device was capable of explosion without a battery. And that's why we're, we are also in a different, um, scenario than, than the Malone cases, et cetera. There was, there was, um, much evidence at trial that if you, if you, um, hit that device too forcefully, if, if there was any static electricity present, anything along those lines, that device would have exploded. And the council points to the words design or intended. And, um, the government already satisfied design. That was by design a destructive device because it was an anti-personnel device. So now the only question is, could it have exploded? And it actually, in its current form, could have. It was very much readily assembled if static electricity passed by it, um, or if someone kicked it, uh, you know, or, or anything of that nature. So the intent, the intent comes into play. And, and I, I, um, in Fredman, in fact, I think Mr. Gunn was the, the defense attorney in Fredman. That was the case. In that case, there was a safe, um, that had totally unassembled parts and there was no evidence of intent. And in that case, the Ninth Circuit said, you have to show us some intent here. That is not, not this case because of the way the device was designed. When you put blasting caps and shotgun shells and wrap them up in tape, you've satisfied the statute as far as intent. And now the only question is, can it be readily assembled? And it can just by static electricity or a simple battery. I wanted to ask you about another part of this case, uh, specifically the motion to suppress. There is a fingerprint on the, on the beer can, but you know, the white truck, there are a lot of white trucks around. Let's forget the white truck a second. Would the fingerprint be enough to get the search warrant? Um, yes, I believe the fingerprint would be enough. Um, considering, uh, the, I mean, there was this factually, this case was odd. You know, somebody spies somebody in the house and they get, they, the owner's not around. The owner comes back. It's not sure when this all happened. No one's sure who was in, when, how long they were in, whether more people were in. Does any fingerprint in that home, uh, on a beer can, I mean, you don't say whether it's a fresh beer can or empty beer can, uh, does any fingerprint give probable cause to search a person's home? Um, I believe in, in this situation where it's, there's evidence of a party, there's fresh fruit, there's unspoiled pizza, there's beer cans. In that instance, a fingerprint on the beer can is very relevant. Would any fingerprint in any home, um, in any case be, I don't think so, and I certainly can't say, but in this instance, because of the scene, the fingerprint was very relevant. And I know we all, white trucks are everywhere. I think the white truck was actually quite relevant too, because this was a burglary and he was, the accusation was, was the stolen goods were a generator and life jackets, and these things need to be hauled away. And so, uh, the, the truck is relevant for that, for that purpose as well, as well. And because of those unique, the uniqueness of those items, it was also relevant to assume that it would still be in someone's home, um, after a month after. Was there any indication the fingerprint was fresh? I mean, how do we know the fingerprint wasn't from stocking a store shelf? I, the indication that the in that, the instance in which it was found, I, we don't have any scientific evidence saying that it was under or over, um, uh, something else or, or anything like that now, but under a fair probability standard, um, I, I do think it, the magistrate judge certainly had probable cause in this instance. And if the court doesn't have any other questions. Okay. Thank you. Um, could I actually ask you just one thing about this jury instruction versus sufficiency? Do you think there's any difference in how we should view this issue? Yes, Your Honor. In fact, when I read it initially, I thought, is this a jury instruction question? Um, and I, I, I think perhaps, um, you're right in that it would require another element. And so perhaps it is a jury instruction question. And under Mr. Gunn's and Mr. Kirkland's about sufficiency of the evidence versus plain air, there might be, um, a difference in the, in the standard. Um, I know in, in the appellants, I think it was the reply brief they pointed out that, you know, plain air in the jury instruction context is different than plain air in the sufficiency context. So perhaps that would affect, affect the standard of review to that extent. And does the government have a position on which way we should look at it? Um, I suppose if it's to the extent that it, it would add an element to a jury instruction, perhaps it is a, a jury instruction question, which then ultimately though gets you to the same insufficient question. So, um, I, I don't have a particular, uh, position on that, although I do think it begs the question that in that regard. Okay. Thank you very much for your argument. Let's give you some time for both, but two minutes. Thank you, Your Honor. Um, you know, one thought I have on if this court ends up setting some new or clarifying as far as a standard, then I think it really is only fair to send it back if you think there's potentially sufficient evidence for a new trial on that issue. I don't think, I mean, our argument, I don't think the defendant in this case, if you, if you articulate the standard in some better way or more clear way, I don't think it's fair to the defendant to have expected him to have anticipated what that standard would be. I think the questions you asked the prosecutor, Ms. Scott, highlight the line drawing problem here and why you just can't go partway down that slope and draw the line. She, her answers were things like, in this instance, the line to be drawn is very fact intensive. Well, you can't create a legal standard that way. Um, I think shotgun shells are, if you're going to have some readily obtainable standard, they're as readily obtainable as batteries. Um, I wrote down some other things. What if the capacitor wasn't there? What if the battery box wasn't there? What if the radio frequency receiver wasn't there? Are those things readily obtainable? I don't know the answer to that. This readily assemblable, readily assemblable, I guess it can be readily assemblable. That's not, that's, that's just, that makes the point that you could have, you could have these parts all over the house under the statutory language. I mean, in Mr. Fredman's case, the reason he was found not guilty is there was a district court finding that he didn't have the requisite intent. So you're saying he should have a new trial. I guess, I guess there seems to be a little bit of a waiver problem on both sides. So like, if you had said we need a jury instruction saying it has to be in the house, maybe, I don't know, maybe the government would have come up with evidence that there were batteries in the house. We, this wasn't really litigated, which is why it feels weird. Well, actually, I think, I think the jury instructions did say he had to possess the parts. It said possess a combination of parts. So, except that we're having this debate about whether that includes batteries or not. Right, right. But it's, it's not, it's not where they were in the house that was not covered by the jury instructions. It's what he had to have. I think, fairly read, the instructions require him to have all the parts because I think that's what basically repeats the statutory language. And that's my position on what the statutory language means. But it's just, as you start getting into where you would draw the line and how you would write the language, I just think you get into a tremendous problem. Maybe key components out of Sheehan works, but that's, that's still pretty fuzzy. And frankly, I think batteries are key components here. So the government doesn't prevail there. So I, I, I think the questions you're honored to ask illustrate the problem of why the interpretation I'm arguing is the one you should take. I could spend a couple seconds on the probable cause issue if you want. I, you know, I just had an argument where the government and the judges kept saying to me, you're, you're, you're, what's the word? You're divide and conquer. And that's what the government's doing here is divide and conquer. Maybe, your honor, there's a split between two state cases that I cited on my briefs. Maybe a fingerprint alone might establish probable cause Mr. Kirkland was in the house. But it's not just that ambiguity or uncertainty. There's the uncertainty about who took the stuff to whose house. There's the uncertainty about whether it's still there a month later. When you layer all of those uncertainties on top of each other, I think probable cause isn't there. So first of all, there's a real issue about the fingerprint. To answer your question, there's nothing at all in the search warrant affidavit, which is, of course, what we'd look at that suggests when that fingerprint got on there. So you're right, it could have come from stocking a shelf. It could have been at his house and some friends came over and took the six pack or whatever it might be. That's the problem with fingerprints. The problem with fingerprints is you don't know how and when they got there. The McMillan case that's discussed in both briefs is different because in the McMillan case, it still had condensation on it. So we knew it was fresh from that store. And it was on the counter right beside where the clerk was shot. So there was good reason to think that the person who had that can was the statement by the defendant because he'd initially denied even being in the store. And he said, I touched this a few hours earlier and there was testimony from the owner about reasons that wouldn't have been possible. So I think it's not just the fingerprints, maybe not enough, and at the very least weak. It's piled on top of two or three other weak things. Okay. Thank you very much. The case just argued will be submitted. Thank you.
judges: Fisher, Watford, Friedland